**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Equal Employment Opportunity Commission, | No. CV-06-1899-PHX-NVW |
| Plaintiff, | **ORDER** |
| vs. | |
| TIN Inc., a Delaware corporation, dba Temple-Inland , | |
| Defendant. | |

Pending before the court is Defendant TIN's Motion for Summary Judgment (doc. #110) and Plaintiff's Motion to Strike and Motion for Leave to File Surreply (doc. #131). Defendant's request for oral argument will be denied because the parties have submitted memoranda thoroughly discussing the law and evidence and the court concludes that oral argument will not aid its decisional process. *See Mahon v. Credit Bureau of Placer County, Inc.*, 171 F.3d 1197, 1200 (9th Cir. 1999).  The Plaintiff has not requested oral argument.

**I.     Plaintiff's Motion to Strike**

LRCiv 56.1(a) requires the moving party to file a separate statement of facts with its summary judgment motion and memorandum of law.  LRCiv 56.1(b) requires the nonmoving party to file with its responsive memorandum in opposition a separate statement indicating for each paragraph of the moving party's statement of facts whether

1   the nonmoving party disputes it and any additional facts that establish a genuine issue of

2   material fact.  LRCiv 56.1(d) permits the moving party to file "a reply memorandum."

3   The rules do not permit the moving party to file a second statement of facts.  This is

4   consistent with the moving party's need to show no genuine issue of material fact exists

5   and that there is no need for a trier of fact to weigh conflicting evidence, assuming the

6   nonmoving party's evidence is true.  The moving party is permitted to object to the

7   admissibility of evidence submitted by the nonmoving party, but must present such

8   objections in its reply memorandum in support of its motion for summary judgment and

9   not in a separate memorandum.  LRCiv 7.2(m)(2).

10   Motions to strike are permitted only in limited circumstances, such as where a

11   filing or submission is not permitted or authorized by statute, rule, or court order.  *See*

12   LRCiv 7.2(m)(1).  Defendant's response to Plaintiff's opposing statement of facts and

13   supplemental appendix, separate from its reply memorandum, are not authorized by the

14   federal and local court rules, and therefore Plaintiff's motion to strike is proper.

15   The court will grant Plaintiff's motion to strike Defendant TIN's Response to

16   Plaintiff EEOC's Statement of Facts in Opposition to Defendant's Motion for Summary

17   Judgment (doc. #129) and Defendant TIN's Supplemental Appendix of Materials in

18   Support of Its Response to Plaintiff EEOC's Statement of Facts in Opposition to TIN's

19   Motion for Summary Judgment (doc. #130).  The court will not consider any portion of

20   Defendant TIN's Reply in Support of Its Motion for Summary Judgment  (doc. #128) that

21   cites to or relies on the stricken materials.

22   **II.    Background**

23   Plaintiff Equal Employment Opportunity Commission ("EEOC") filed this action

24   under the Age Discrimination in Employment Act on behalf of a class of five former

25   employees of Defendant TIN, Inc. d/b/a Temple Inland ("TIN") who worked at TIN's

26   Phoenix, Arizona, plant and whose terminations EEOC asserts were the result of age

27   discrimination.  (Doc. #121, ¶ 1.)  The terminations occurred in January 2003, May 2004,

28   January 2005, January 2006, and February 2006.

1    TIN is a manufacturing company that makes containerboard, a type of heavy
2 brown paper, which it converts into a complete line of corrugated packaging and specialty
3 packaging products. (*Id.* at ¶ 3.) TIN operates corrugated packaging plants and
4 converting plants across the United States and in Mexico. (*Id.*) TIN acquired the
5 corrugated box plants, including the Phoenix plant, in approximately April 2002. (*Id.* at
6 ¶ 4.)

7    TIN is organized in regions spanning the United States and parts of Mexico. (*Id.*
8 at ¶ 7.) When TIN acquired the Phoenix plant, it assigned the plant to TIN's International
9 Group. (*Id.* at ¶ 8.) At that time, management of the Phoenix plant reported to Birg
10 Mishurda, Regional Vice President for the International Group. (*Id.* at ¶ 9.) During the
11 summer of 2002, Mishurda created regions within the International Group and assigned
12 the Phoenix plant to report to Juan Ramon Garza, who began managing the Pacific
13 Frontier Region from Phoenix. (*Id.* at ¶¶ 11-12.)

14    In January 2006, TIN moved the Phoenix plant from the International Group to the
15 Western Plains District within the Western Region. (*Id.* at ¶ 15.) At that time, the
16 Phoenix plant reported to Larry Siebert, District Manager for the Western Plains District,
17 who reported to Bruce Grube, Regional Vice President for the Western region. (*Id.* at
18 ¶¶ 15-16.) After further reorganization in November 2006, the Phoenix plant reported
19 directly to Grube. (*Id.* at ¶¶ 18–20.)

20    The Phoenix plant was not profitable between 1997 and the time TIN acquired it.
21 (*Id.* at ¶ 38.) In Mishurda's initial assessment, he concluded that the plant's underlying
22 problem was the internal inefficiency of manufacturing, which caused sales to be lower
23 than the plant needed to be profitable. (*Id.* at ¶ 46.) Mishurda also concluded that the
24 plant had very high costs, very high turnover, and low employee morale. (*Id.*) TIN's
25 corporate office controlled several factors that affected financial reports of the Phoenix
26 plant's profitability, such as depreciation of unused equipment, other fixed costs, and the
27 cost of paper the Phoenix plant obtained from TIN's paper mills. (Doc. #120, ¶¶ 6-13.)

28

1

**A.     David Neal**

2          David Neal was born on July 31, 1946.  (Doc. #121, ¶ 32.)   Neal was the General

3    Manager of the Phoenix plant from June 1997, before TIN's April 2002 acquisition, until

4    Mishurda (with Garza's input) terminated Neal's employment on January 10, 2003.  (*Id.*

5    at ¶¶ 34, 42, 62, 73.)

6          Following Neal's termination, Garza served as General Manager of the Phoenix

7    plant.  (*Id.* at ¶ 72.)  Garza was born on August 19, 1961.  (*Id.* at ¶ 11.)  At the time of

8    Neal's termination, Garza was Neal's direct supervisor.  (*Id.* at ¶¶ 10-11.)  In 2001, Garza

9    was the interim General Manager of a different plant, which was not profitable during

10   Garza's interim management.  (Doc. #120, ¶ 2.)

11

**B.     Hector Flores**

12         Hector Flores was born on November 3, 1956.  (Doc. #121, ¶ 32.)  In 2003, Flores

13   was terminated from a job with a TIN competitor.  (*Id.* at ¶ 97.)  In September or October

14   2003, Mishurda hired Flores as a consultant at the Phoenix plant to help process orders

15   more quickly and to manage plant inventory levels.  (*Id.* at ¶¶ 98, 100.)  In April or May

16   2004, Mishurda and Garza moved Flores into the General Manager position.  (*Id.* at

17   ¶ 101.)  Shortly after the Phoenix plant began reporting to Siebert and Grube in January

18   2006, Siebert terminated Flores with Grube's approval on February 22, 2006.  (*Id.* at

19   ¶¶ 113-114.)  Neither Mishurda nor Garza was involved in Flores's termination.  (*Id.* at

20   ¶ 124.)

21         After Flores's termination, Martin Monkewicz served as interim General Manager

22   from March 2006 until October 2006 and then as General Manager after October 2006.

23   (*Id.* at ¶¶ 131-132, 136.)  Monkewicz was born on September 25, 1964.  (Doc. #120-2 at

24   4.)  Monkewicz testified that in 2005 Garza said he wanted to groom Monkewicz for a

25   general manager position.  (Doc. #120, ¶ 95.)

26

**C.     Clifton McGraw**

27         Clifton McGraw was born on April 23, 1941.  (Doc. #121, ¶ 153.)  On November

28   4, 2002, McGraw was hired as the Production Manager for the Phoenix plant.  (*Id.* at

¶ 158.)  The Production Manager manages most of the hourly employees at the facility, facility maintenance, and product production, including creating the product and ensuring delivery of the product.  (*Id.* at ¶ 23.)  Both Neal and Mishurda interviewed McGraw before he was hired, and Mishurda cautioned Neal against hiring McGraw.  (*Id.* at ¶¶ 155-157.)  On January 5, 2004, McGraw was transferred to a new Logistics Manager position that Garza created.  (*Id.* at ¶¶  29, 165.)

Garza filled the vacant Production Manager position with Felipe Juarez.  (*Id.* at ¶ 167.)  In May 2004, Garza eliminated the Logistics Manager position with Mishurda's approval.  (*Id.* at ¶¶ 31, 175.)  Then Juarez and Monkewicz performed the duties previously assigned to the Logistics Manager.  (*Id.* at ¶ 180.)  Subsequently, Mishurda transferred Juarez to a plant in Mexico because he was having a "rough time" as a production manager in Phoenix and was not getting the results Mishurda had hoped for. (Doc. #120, ¶¶ 143-144.)  Juarez was born on January 18, 1961.  (*Id.* at ¶ 140.)

**D.    John Vanecko**

John Vanecko was born on April 24, 1944.  (Doc. #121, ¶ 187.)  Vanecko began his employment as the Controller for the Phoenix plant before TIN acquired the plant. (*Id.*)  As the Phoenix plant Controller, Vanecko maintained the finances of the facility. (*Id.* at ¶ 188.)  Garza was not aware of any performance problems of Vanecko.  (Doc. #120-2 at 44.)

In approximately February 2003, Garza decided to promote Denise Cervantes to the position of Regional Controller with an office in Phoenix.  (Doc. #121, ¶ 195.)  As of January 20, 2005, the Regional Controller and Phoenix Plant Controller positions were replaced with a new consolidated position.  (Doc. #120, ¶ 162.)  Garza made the decision to hire Cervantes instead of Vanecko for the consolidated Controller position.  (*Id.* at ¶ 167.)  He chose Cervantes over Vanecko because he believed Cervantes had knowledge and expertise, *e.g.*, regarding Mexican tax laws and "the Mexican way of doing business," that he thought were necessary for the regional controller part of the job.  (Doc. #120-2 at 46.)  When Cervantes resigned from the consolidated Controller position near the end of

1   2005, TIN hired a Plant Controller instead of filling the consolidated Controller position.

2   (Doc. #120, ¶¶ 184-186.)  Cervantes was born on June 1, 1968.  (Doc. #120, ¶ 160.)

3       **E.**   **Paul Ives**

4         Paul Ives was born on April 6, 1947.  (*Id.* at ¶ 192.)  Ives was hired as

5   Maintenance Supervisor for the Phoenix plant in 1993.  (Doc. #121, ¶ 220.)   His title

6   later was changed to Maintenance Superintendent although his position and job did not

7   change.  (*Id.* at ¶¶ 221- 222.)  On January 10, 2006, Ives was informed his employment

8   would be terminated.  (*Id.* at ¶ 274.)  Garza approved Ives' termination.  (*Id.* at ¶ 270.)

9   Mishurda was not involved in the decision to terminate Ives.  (*Id.* at ¶ 272.)

10         In May 2006, James Hawley was hired as the Maintenance Superintendent for the

11   Phoenix plant.  (*Id.* at ¶ 279.)  TIN terminated Hawley for poor performance on January

12   2, 2007.  (*Id.* at ¶ 281.)  Hawley was born on August 26, 1974.  (Doc. #120, ¶ 241.)

13   **III.**   **Analysis**

14       **A.**   **Legal Standard for Summary Judgment**

15         The court should grant summary judgment if the evidence shows there is no

16   genuine issue as to any material fact and the moving party is entitled to judgment as a

17   matter of law.  Fed. R. Civ. P. 56(c).  The moving party must produce evidence and

18   persuade the court there is no genuine issue of material fact.  *Nissan Fire & Marine Ins.*

19   *Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  To defeat a motion for

20   summary judgment, the nonmoving party must show that there are genuine issues of

21   material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  A material fact

22   is one that might affect the outcome of the suit under the governing law.  *Id.* at 248.  A

23   factual issue is genuine "if the evidence is such that a reasonable jury could return a

24   verdict for the nonmoving party."  *Id.*  When the moving party has carried its burden

25   under rule 56(c), the nonmoving party must produce evidence to support its claim or

26   defense by more than simply showing "there is some metaphysical doubt as to the

27   material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

28

1    (1986).  Where the record, taken as a whole, could not lead a rational trier of fact to find

2    for the nonmoving party, there is no genuine issue of material fact for trial.  *Id.*

3         In this context, the court presumes the nonmoving party's evidence is true and

4    draws all inferences from the evidence in the light most favorable to the nonmoving party.

5    *Eisenberg v. Insurance Co. of North America*, 815 F.2d 1285, 1289 (9th Cir. 1987).  If the

6    nonmoving party produces direct evidence of a genuine issue of fact, the court does not

7    weigh such evidence against the moving party's conflicting evidence, but rather submits

8    the issue to the trier of fact for resolution.  *Id.*  "[T]he court should give credence to the

9    evidence favoring the nonmovant as well as that 'evidence supporting the moving party

10   that is uncontradicted and unimpeached, at least to the extent that that evidence comes

11   from disinterested witnesses.'"  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S.

12   133, 151 (2000).

13        **B.    Legal Standard for ADEA Claims**

14        The Age Discrimination in Employment Act ("ADEA") makes it unlawful to

15   discharge any individual because of the individual's age.  29 U.S.C. § 623(a)(1).

16   Liability for disparate treatment based on age depends on whether age "*actually*

17   *motivated*" the employer's decision, that is, "the plaintiff's age must have actually played

18   a role in the employer's decision-making process and had a determinative influence on

19   the outcome."  *Enlow v. Salem-Keizer Yellow Cab Co.*, 389 F.3d 802, 811 (9th Cir. 2004)

20   (internal quotations, alterations, and citations omitted).

21        When an employee alleges disparate treatment based on direct evidence in an

22   ADEA claim, the court does not apply the burden-shifting analysis set forth in *McDonnell*

23   *Douglas Corp. v. Green*, 411 U.S. 792 (1973), to determine whether the evidence is

24   sufficient to defeat a motion for summary judgment.  *Enlow*, 389 F.3d at 812 (citing

25   *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985)).  "Direct evidence, in

26   the context of an ADEA claim, is defined as evidence of conduct or statements by persons

27   involved in the decision-making process that may be viewed as directly reflecting the

28   alleged discriminatory attitude ... sufficient to permit the fact finder to infer that that

1    attitude was more likely than not a motivating factor in the employer's decision." *Enlow*,

2    389 F.3d at 812 (internal quotations, alterations, and citations omitted).

3           Where an employee must rely on circumstantial evidence, the court evaluates

4    ADEA claims by using the three-stage burden-shifting framework established in

5    *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Id.*; *Diaz v. Eagle Produce*

6    *Limited Partnership*, 521 F.3d 1201, 1207 (9th Cir. April 4, 2008).[1]  *Cf. Schnidrig v.*

7    *Columbia Machine, Inc.*, 80 F.3d 1406, 1409 (9th Cir. 1996) (plaintiff must first establish

8    *prima facie* case of discrimination, which may be based either on direct evidence of

9    discriminatory intent or on a presumption arising from factors such as those set forth in

10   *McDonnell Douglas Corp. v. Green*).

11          At the first stage, the employee must establish a *prima facie* case of discrimination.

12   *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1281 (9th Cir. 2000).  To establish a *prima*

13   *facie* case using circumstantial evidence, an employee must show that he:  (1) was a

14   member of the protected class, (2) performed his job satisfactorily, (3) was terminated,

15   and (4) was replaced by substantially younger employees with equal or inferior

16   qualifications or, where his job was eliminated,[2] "circumstances giving rise to an

17   inference of age discrimination."  *Id.*  The employee can establish this inference by

18   showing the employer had a continuing need for his skills and services in that his duties

19   still were being performed.  *Id.*

20          If the employee establishes a *prima facie* case of unlawful age discrimination, the

21   burden shifts at the second stage to the employer to articulate a legitimate

22   nondiscriminatory reason for its employment decision.  *Id.*  If the employer satisfies its

23

24          [1] Disparate treatment claims under the ADEA are analyzed by the same standard used
     to analyze disparate treatment claims under Title VII.  *Coleman v. Quaker Oats Co.*, 232

25   F.3d 1271, 1295 (9th Cir. 2000).

26          [2] Where the employee is not replaced because the job is eliminated, the situation is
     analogous to a reduction in force, which allows proof of an inference of age discrimination

27   instead of proof of replacement.  *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 891 (9th Cir. 1994).

28

1    burden, then at the third stage, the employee must prove that the employer's alleged

2    reason for the adverse employment decision constitutes mere pretext for another motive

3    that is discriminatory.  *Id.*  Despite the burden shifting, the employee always bears the

4    ultimate burden of proving the employer intentionally discriminated because of the

5    employee's age.  *Id.*

6         At the third stage, the employee must do more to establish pretext than establish a

7    *prima facie* case and deny the credibility of the employer's witnesses.  *Id.* at 1282.  At

8    this stage, the employee may defeat summary judgment by satisfying the usual standard

9    of proof for summary judgment, *i.e.*, evidence in the record such that a reasonable jury

10   could find by a preponderance of the evidence the employer's actions were based on the

11   employee's age.  *See Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th

12   Cir. 2006).

13        The employee may establish pretext through direct or circumstantial evidence.

14   *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998).  The employee can

15   establish pretext (1) directly, by persuading the court a discriminatory reason more likely

16   motivated the employer,[3] or (2) indirectly, by showing the employer's explanation is

17   unworthy of credence because it is internally inconsistent or otherwise not believable.

18   *Id.*; *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 849 (9th Cir. 2004).  In

19   some cases a combination of direct and indirect evidence may serve to establish pretext.

20   *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1127 (9th Cir. 2000).

21        "Direct evidence is evidence which, if believed, proves the fact [of discriminatory

22   animus] without inference or presumption."  *Godwin*, 150 F.3d at 1221; *accord Stegall v.

23   Citadel Broadcasting Co.*, 350 F.3d 1061, 1066 (9th Cir. 2004).  "When the plaintiff offers

24   direct evidence of discriminatory motive, a triable issue as to the actual motivation of the

25

26        [3]  What is referred to here as "direct" evidence is direct evidence of an employer's
27   discriminatory intent or bias from which a jury could infer the employer's justification is
     pretext. It is not direct evidence that the employer's explanation is false. *Cornwell v. Electra
28   Cent. Credit Union*, 439 F.3d 1018, 1029 & n.7 (9th Cir. 2006).

1    employer is created even if the evidence is not substantial." *Id.* (both).  "The plaintiff is

2    required to produce 'very little' direct evidence of the employer's discriminatory intent to

3    move past summary judgment." *Godwin*, 150 F.3d at 1221; *Chuang*, 225 F.3d at 1128.

4            The Ninth Circuit has stated that when the plaintiff relies on indirect,

5    circumstantial evidence to show that the employer's motives were different from its stated

6    motives, the evidence must be "specific" and "substantial" evidence of pretext to create a

7    triable issue and survive summary judgment.  *Godwin*, 150 F.3d at 1222; *Stegall*, 350

8    F.3d at 1066.  Subsequently, a Ninth Circuit panel interpreted United States Supreme

9    Court and Ninth Circuit precedent as holding that in the context of summary judgment, a

10   plaintiff relying on circumstantial evidence is not required "to produce more, or better,

11   evidence than a plaintiff who relies on direct evidence." *Cornwell v. Electra Cent. Credit*

12   *Union*, 439 F.3d 1018, 1030 (9th Cir. 2006) (citing *Desert Palace, Inc. v. Costa*, 539 U.S.

13   90, 100 (2003); *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1124 (9th Cir. 2004)).

14   More recently, a Ninth Circuit panel observed that the Circuit "has not clearly resolved

15   this issue," citing *Cornwell* and *McGinest* as holding circumstantial and direct evidence

16   should be treated alike, and other post-*Costa* cases, *e.g.*, *Dominguez-Curry v. Nevada*

17   *Transp. Dep't*, 424 F.3d 1027, 1038 (9th Cir. 2005), that have held a plaintiff's

18   circumstantial evidence of pretext must be "specific" and "substantial."[4]

19           Generally, in an employment discrimination action, the employee need produce

20   "very little evidence" to overcome an employer's motion for summary judgment.  *Chuang*

21   *v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1124 (9th Cir. 2000); *accord Diaz*, 2008

22   521 F.3d at 1207.  This is because the resolution of the ultimate question requires "a

23   searching inquiry" that is most appropriately conducted by a fact finder on a full record.

24   *Chuang*, 225 F.3d at 1124.  At trial, the employee must prove both that the employer's

25   alleged reason for the employment decision was false and that discrimination was the real

26

27           [4]  *Davis* did not need to decide the issue because it found the plaintiff had offered

28   specific and substantial evidence.  *Id.* at 1091.

reason, but to survive summary judgment, the employee is not required to provide direct evidence of discriminatory intent as long as a reasonable fact finder could conclude, based on the employee's *prima facie* case and the fact finder's disbelief of the employer's reasons for the decision, that discrimination was the real reason for the employment decision. *Nidds v. Schindler Corp.*, 113 F.3d 912, 918 n.2 (9th Cir. 1997).

      **C.    TIN's Comments Are Not Direct Evidence of Discriminatory Motive.**

      The EEOC contends numerous statements made by Mishurda and Garza constitute direct evidence of age discrimination.  To avoid the three-stage, burden-shifting *McDonnell Douglas* analysis, the EEOC must produce evidence of conduct or statements by persons involved in TIN's termination decisions that directly reflect the alleged discriminatory attitude sufficient to permit a jury to infer that that attitude was more likely than not a motivating factor in the employer's decisions.  *See Enlow*, 389 F.3d at 812. "Direct evidence typically consists of clearly sexist, racist, or similarly discriminatory statements or actions by the employer."  *Coghlan v. American Seafoods Co.*, 413 F.3d 1090, 1095 (9th Cir. 2005); *accord Dominguez-Curry*, 424 F.3d at 1038.   When the employer's statements do not directly concern the plaintiff employee, some inference is necessary to establish discrimination with regard to that plaintiff, but "[w]hen the evidence establishes the employer's animus toward the class to which the plaintiff belongs, the inference to the fact of discrimination against the plaintiff is sufficiently small that [the court has] treated the evidence as direct."  *Coghlan*, 413 F.3d at 1095 n.6. But "stray remarks"—isolated discriminatory comments unrelated to the decision-making process—are insufficient to establish discrimination.  *Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1438 (9th Cir. 1990).

      For example, on three separate occasions telling an employee seeking a promotion that the Board wanted somebody younger for the job was considered direct evidence of discriminatory motive whereas choosing to promote a younger candidate over an older one because he was "a bright, intelligent, knowledgeable young man" was not. *Compare Schnidrig*, 80 F.3d at 1411 (summary judgment for employer inappropriate), with *Merrick*

1  *v. Farmers Ins. Group*, 892 F.2d 1434, 1438-39 (9th Cir. 1990) (summary judgment for

2  employer appropriate).  A decisionmaker's statements, connected to a discharge, that an

3  employee was "old and burnt out," "too old to change," "old geezer," and "old fart," and

4  the employee "did not fit the [company] mold of a young, aggressive type manager like

5  they had in most other management positions" served as evidence of the fact the

6  employee was discharged because of his age.  *EEOC v. Pape Lift, Inc.*, 115 F.3d 676,

7  679, 684 (9th Cir. 1997).  A decisionmaker's statements that the employee "was so old

8  [he] must have come over on the Mayflower" and he "was too damn old to do [his] job,"

9  which were not made in the direct context of the employee's termination, were considered

10 "additional evidence of age-based animus."  *Reeves v. Sanderson Plumbing Prods., Inc.*,

11 530 U.S. 133, 151-53 (2000).  A supervisor's statement that "he intended to get rid of all

12 the 'old timers' because they would not 'kiss my ass,'" and a supervisor's statement that

13 "[w]e don't necessarily like grey hair," which were not tied directly to the employment

14 decisions, were held to be "at best weak circumstantial evidence" and "not enough to

15 create an inference of age discrimination."  *Nidds v. Schindler Elevator Corp.*, 113 F.3d

16 912,915, 918-19 (9th Cir. 1997);  *Nesbit v. Pepsico*, 994 F.2d 703, 705 (9th Cir. 1993).

17       Here, the EEOC concedes the comments it alleges to be direct evidence of

18 discriminatory motivation were not directed at any of the class members or related to their

19 terminations.  (*See* doc. ##110 at 13-14, 119 at 6-7.)  It further concedes that the

20 comments were made only by Mishurda, who was responsible for terminating Neal, and

21 Garza, who terminated Ives and was responsible for consolidating positions and then

22 eliminating McGraw's and Vanecko's positions. (Doc. #119 at 3-6.)  None of the

23 allegedly discriminatory remarks were made by Siebert, who terminated Flores, or Grube,

24 who approved Flores's termination, and the EEOC did not dispute TIN's statement that

25 neither Mishurda nor Garza was involved in Flores's termination.  (Doc. ##119 at 3-4,

26 121, ¶ 124.)

27       The EEOC summarizes Mishurda's comments as showing "Mishurda connected

28 age with energy, health, vitality, and creativity."  (Doc. #120, ¶ 15.)  Neal testified that

1   Mishurda was concerned about employees who "retired on the job," and lacked energy,

2   creativity, and "that young thinking sort of mentality." (Doc. #120-2 at 238, 242.) Neal

3   described his first meeting with Mishurda in 2002:

> And in the course of the conversation, as we talked about the profile of my team and I went through each member of the team and explained their background, their experience, their longevity with the company, pluses and minuses of their performance, he was very inquisitive about their health, their well being, their age.
> Q.   He asked their age?
> A.   Yes.
> Q.   He asked what each of their dates of birth was?
> A.   No.
> Q.   What did he say exactly?
> A.   "How old are these people?"
> Q.   Go ahead.
> A.   And so we described and went over the direct reports.
> Q.   Did you tell him what their ages were?
> A.   I did not know their ages. I just said approximately 50, 60, 40, whatever they were.
> And then we went on and we talked about vitality and the new ideas, and that's where these, the new blood and the dream team came []. And he told me about his dream team and he told me about examples of the dream team. An example was ... one of the young guys that turned around a plant in Imperial Valley, and how he had come in and with all this energy and all these new ideas and turned this plant around in a heartbeat and how proud he was of these young lions and tigers that were out there.

16   (Doc. #112-5 at 26, Neal Tr. 184:8-185:10.)

17          Neal also testified that Mishurda vetoed hiring "an ideal candidate in his 50s" for

18   the Production Manager position because Mishurda was "obsessed with people retiring on

19   the job and age and energy," but Mishurda did not veto hiring 61-year-old McGraw for

20   that position. (*Id.* at 29-30, Neal Tr. 217:12-219:19.) Mishurda only cautioned Neal

21   against hiring McGraw, saying, "You seem to have a tendency to hire older people," and

22   "that it appeared to him that he might have a tendency to retire on the job, that he might

23   have a tendency not to have the energy, as a production manager's position was a very

24   fast moving, energetic kind of position." (*Id.* at 23, Neal Tr. 140:22-141:6.)

25          Alex Salomon, a TIN employee assigned to the Monterey, Mexico facility and

26   later the Imperial Valley, California facility, testified that over the years 1996-2002 he

27   heard Mishurda refer to others as "old," "old school," "old fashioned," "old guard," and

28   "not energetic," while referring to Salomon as "energetic" and "youthful." (Doc. #120,

- 13 -

¶¶ 27-40.)   Salomon said Mishurda referred to his "roster of champions" as "young blood" and "young breed" and said the business needed "young," "fresh," and "energetic" people and "motivated blood."  (*Id.*)  Mishurda told Salomon "older people should move on and learn new tricks."  (*Id.* at ¶ 39.)  Salomon further testified that during a telephone conversation with Mishurda in June 2002, Mishurda said "we are replacing older employees" "referring to the change of team or the change of personnel at the Imperial Valley level"  in the context of referring to "replacing older ways of doing business with his roster of champions," "young blood," and "young breed."  (*Id.* at ¶ 33, doc. #120-2 at 321-22, 325-26, Salomon Tr. 197:17-198:25, 202:16-203:1.)  Salomon also testified that Mishurda referred to the business as a "young man's game," which Salomon interpreted as meaning he would need "[y]outh, energy, new mind, modernism" to do his next assignment properly because the Imperial Valley management group was "old," an "old way of doing business," and "was not performing."  (Doc. #120-2 at 342-43, Salomon Tr. 236:24-237:21.)  Salomon said these comments were "part of the pep talk" to motivate him for his new assignment.  (*Id.*)

In June 2002, when Mishurda interviewed a 51-year-old candidate for the Sales Manager position at the Phoenix facility with Garza and Neal, Mishurda openly discussed the "pros and cons" of hiring an "older" sales manager.  (Doc. #120, ¶ 41.)  Mishurda said something like, "Basically what we need to decide is when we're looking at someone older like yourself is that you obviously have the experience, but compared to a young guy, would you be willing to go out into that hot Phoenix sun, climb the stairs and make the sales calls with your sales rep?  A young guy would be hungry and maybe have more energy."  (*Id.*)  Mishurda asked the candidate, "[I]t's hot out there, do you really want to go back to pounding the bricks?  It's a young man's job."  (*Id.*)  Mishurda subsequently told Neal not to hire the candidate because Mishurda "was concerned that he didn't have the energy, he was concerned that he would retire on the job, he was concerned that he wouldn't go back and play the young man's game."  (*Id.* at ¶ 42.)  Mishurda also told

1   Flores he had terminated the general manager of another plant because he had "retired on

2   the job."  (*Id.* at ¶ 26.)

3          Garza questioned whether a California sales broker in his 70's had the physical

4   ability to do his job.  (*Id.* at ¶ 43.)  Garza and Mishurda talked about a sales manager

5   getting on in age, retiring on the job, lacking energy, being overweight, golfing, and

6   drinking.  (*Id.* at ¶¶ 44-45.)  Garza referred to the sales manager as "perro viejo," meaning

7   "old dog," and said "an old dog does not learn new tricks."  (*Id.* at ¶¶ 49-51.)  Garza also

8   said the Phoenix plant was "lacking juice," was being run slowly and inefficiently, and

9   needed "young people with push."  (*Id.* at ¶¶ 49, 51-52.)

10         When Garza asked Flores if he was sure that he wanted to hire Bill Childress as

11  Production Manager, he mentioned that he had seen Childress falling asleep during

12  meetings, which Flores interpreted as meaning that Childress did not have energy to last

13  all day because he was an older guy.  (*Id.* at ¶ 55; Doc. #120-2 at 277-278, Flores Tr.

14  65:15-66:9.)  Nevertheless, Flores hired Childress as production manager, and Garza,

15  who was Flores's boss at the time, did not prevent the hiring.  (Doc. #120-2 at 278, Flores

16  Tr. 66:12-23.)

17         In 2004 or 2005, Daniel Garcia, the Human Resources Manager for the

18  International Division in Mexico, came to the Phoenix plant for about a week, conducted

19  a study, and presented the results of his study to help the Phoenix plant with absenteeism

20  and turnover.  (Doc. #120, ¶¶ 57-58.)  During his presentation, Garcia suggested that

21  employees in certain age groups have more or less turnover, but neither Flores nor the

22  Human Resources Manager for the Phoenix plant could remember which age group

23  Garcia said had the greatest turnover.  (*Id.* at ¶ 59.)

24         Accepting the EEOC's evidence as true and drawing all inferences in the EEOC's

25  favor, Mishurda's and Garza's comments do not establish Mishurda or Garza had animus

26  toward people over the age of 40 years old from which it may be inferred that age-based

27  animus was more likely than not a motivating factor in the terminations of Neal, Flores,

28  McGraw, Vanecko, or Ives.  The evidence shows that Mishurda, and perhaps also Garza,

1    were concerned that older employees may not perform as well as younger employees in

2    positions requiring physical endurance and energy, may not be willing to adopt new

3    strategies, and may prefer a job that permits them to collect a paycheck without

4    continuing to work as hard as before, *i.e.*, "retire on the job."  But the evidence does not

5    establish that Mishurda or Garza assumed those characteristics applied to all older

6    workers—in fact, their cautiousness did not prevent TIN from hiring 61-year-old

7    McGraw or Childress.   Moreover, when Mishurda said "we are replacing older

8    employees," he was not referring to terminations at the Phoenix plant, but rather to the

9    change of personnel at the Imperial Valley plant, and there is no evidence connecting that

10   comment to the terminations of  Neal, Flores, McGraw, Vanecko, or Ives.

11          Therefore, the allegedly discriminatory statements submitted by the EEOC do not

12   constitute direct evidence that TIN had a discriminatory motive in the terminations of

13   Neal, Flores, McGraw, Vanecko, or Ives.  They are instead circumstantial evidence the

14   court will consider in determining whether the EEOC has met its burden in proving TIN's

15   justification for the terminations is pretextual.

16          **D.    Stage I of *McDonnell-Douglas* Analysis:  The EEOC Has Established a
            *Prima Facie* Case of Discrimination for Four of the Five Former
17          Employees.**

18          The requisite degree of proof necessary to establish a *prima facie* case of

19   discrimination for "claims on summary judgment is minimal and does not even need to

20   rise to the level of a preponderance of the evidence."  *Davis v. Team Elec. Co.*, 520 F.3d

21   1080, 1089 (9th Cir. 2008).  Based on the facts described above, most of which are

22   undisputed, the EEOC has clearly shown three of the four elements of a *prima facie* case

23   for each of the five class members.  Each was terminated, at least forty years old at the

24   time of termination, and replaced by a substantially younger employee with equal or

25   inferior qualifications.  Where the positions were eliminated, the terminated employee's

26   duties were assigned to a substantially younger employee with equal or inferior

27   qualifications.  The fourth element, whether the class members performed their jobs

28   satisfactorily, requires closer analysis.

1

### 1.    David Neal

2      Mishurda, with Garza's input, terminated 56-year-old Neal and assigned Neal's

3  General Manager responsibilities to 41-year-old Garza, who had previously served as

4  interim General Manager of a different plant, which also was not profitable.  In Garza's

5  opinion, Neal "was not going to be a good General Manager for the Phoenix plant given

6  the situation we were in."  (Doc. #121, ¶ 57.)  In Mishurda's opinion, Neal was not

7  capable of improving the performance of the Phoenix plant as quickly as TIN wanted the

8  performance improved.  (*Id.* at ¶ 59.)  Mishurda said he also based his decision to

9  terminate Neal on his perception that Neal did not appear to accept Garza as his manager

10  and his belief that Neal was focused more on receiving compensation under a severance

11  agreement than on plant business.  (*Id.* at ¶ 63.)

12      Mirshurda and Garza communicated to Neal their concerns about the Phoenix

13  plant's profitability and had discussions with Neal regarding a plan to move the plant

14  toward profitability.  (Doc. #120-2 at 209-210.)  But Neal never had a formal

15  performance review that focused on plant profitability, and Mirshurda and Garza gave

16  him positive feedback regarding the business plan and how he was doing.  (*Id.* at 210-

17  211.)  Neal never was informed that his job was in jeopardy because the plant was not

18  profitable enough.  (*Id.* at 258, ¶ 16.)  Thus, presuming the EEOC's evidence to be true

19  and because the requisite degree of proof is minimal, the court concludes the EEOC has

20  established that Neal performed his job satisfactorily.

21      The EEOC, therefore, has established a *prima facie* case of unlawful age

22  discrimination with respect to Neal.

23

### 2.    Hector Flores

24      After slightly less than two years as General Manager, 49-year-old Flores was

25  terminated and replaced by 41-year-old Monkewicz, who did not have experience as a

26  General Manager.  The Phoenix plant moved toward profitability during part of Flores's

27  management.  (Doc. #120, ¶ 87.)  In 2005, the Phoenix plant's profitability regressed, due

28  to multiple factors, including market conditions, corporate decisions regarding paper

1   pricing, and increases in energy, wax, and labor costs.  (*Id.* at ¶¶ 113-118.)  Reduction in

2   productivity caused by decisions made by Mishurda, Garza, and Juarez also adversely

3   affected profitability of the Phoenix plant.  (*Id.* at ¶¶ 119-22.)  Flores believes the Phoenix

4   plant's equipment was in severe disrepair, which resulted in excessive downtime.  (Doc.

5   #121, ¶ 111.)

6        Flores never received an annual performance review.  (*Id.* at ¶ 109.)  The only

7   performance feedback he received consisted of his merit bonus and his merit increase in

8   pay.  (*Id.*)  Based on this feedback, Flores believed TIN was satisfied with his

9   performance as General Manager.  (*Id.* at ¶ 110.)  Thus, presuming the EEOC's evidence

10   to be true and because the requisite degree of proof is minimal, the court concludes the

11   EEOC has established that Flores performed his job satisfactorily.

12        The EEOC, therefore, has established a *prima facie* case of unlawful age

13   discrimination with respect to Flores.

14              **3.      Clifton McGraw**

15        Although Mishurda cautioned Neal not to hire McGraw as Production Manager,

16   Neal did so when McGraw was 61 years old.  Two months later Neal was terminated.

17   Fourteen months after McGraw was hired, Garza transferred 62-year-old McGraw to a

18   newly created Logistics Manager position, which Garza eliminated four months later.

19   Juarez, then 43 years old, and Monkewicz, then 46 years old, shared what had been

20   McGraw's duties under both positions.  Juarez subsequently was transferred to a plant in

21   Mexico because he was not performing successfully at the Phoenix plant.

22        McGraw's transfer to Logistics Manager was considered a demotion.  (Doc. #120,

23   ¶ 139.)  However, the EEOC has not alleged that McGraw was wrongfully demoted from

24   the Production Manager position, only that McGraw was wrongfully terminated from the

25   Logistics Manager position.  (Doc. ##1, 121, ¶¶ 160-162.)  As Logistics Manager,

26   McGraw was held responsible for areas such as customer service returns and allowances

27   and shipping department overtime even though he did not have power to change those

28   areas and did not manage the people who could change those areas.  (Doc. #120, ¶ 145.)

1  McGraw served as Logistics Manager for just over four months.  (*Id.* at ¶ 148.)  McGraw

2  never received any negative performance reviews during his employment with TIN.

3  (Doc. #120, ¶ 133.)  Thus, presuming the EEOC's evidence to be true and because the

4  requisite degree of proof is minimal, the court concludes the EEOC has established that

5  McGraw performed his job satisfactorily.

6          The EEOC, therefore, has established a *prima facie* case of unlawful age

7  discrimination with respect to McGraw.

8                          **4.      John Vanecko**

9          Garza promoted Cervantes to the position of Regional Controller and then replaced

10  both the Regional Controller and the Plant Controller positions with a consolidated

11  position.  By choosing 36-year-old Cervantes over 60-year-old Vanecko for the

12  consolidated position, Garza terminated Vanecko's employment.  Less than a year later,

13  Cervantes resigned.

14          Although Garza made the decision to terminate Vanecko, Garza testified he had

15  observed Vanecko's performance as a controller and was not aware that Vanecko had any

16  performance problems.  (Doc. #120-2 at 44.)  Thus, presuming the EEOC's evidence to

17  be true and because the requisite degree of proof is minimal, the court concludes the

18  EEOC has established that Vanecko performed his job satisfactorily.

19          The EEOC, therefore, has established a *prima facie* case of unlawful age

20  discrimination with respect to Vanecko.

21                          **5.      Paul Ives**

22          Ives was 58 years old when he was informed his employment as Maintenance

23  Superintendent would be terminated.  A few months later, he was replaced by 31-year-old

24  Hawley, who was subsequently terminated for poor performance.

25          Ives was responsible for the maintenance of all the equipment at the Phoenix plant,

26  and the Production Manager shared responsibility for ensuring that preventive

27  maintenance was performed.  (Doc. #121, ¶ 224.)  Ives was responsible for equipment

28  maintenance at the Phoenix plant from approximately 1993 to January 2006.  (Doc. #120,

1   ¶ 193.)  Class member McGraw was the Production Manager from November 2002 until

2   January 2004, and McGraw said he did not have any problems with Ives' performance.

3   (Doc. ##121, ¶¶ 158, 165; 120-2 at 392.)  But, according to class member Flores, Ives

4   was "part of many management teams that ran that plant for many years," and those

5   management teams, including Ives, were responsible for "excessive downtime ... caused

6   by years of undermaintenance of the equipment."  (Doc. #120-2 at 269.)

7       When Juarez was Production Manager, Juarez reported to Flores that Ives needed

8   to improve his performance.  (*Id.* at 292.)  Although Juarez wanted to replace Ives, Juarez

9   had not documented that Ives did not have good performance, and Juarez had not

10  prepared a plan to give Ives opportunity to improve his performance.  (*Id.*)

11      Rick Sullivan visited the Phoenix plant in December 2005 for the purpose of

12  analyzing maintenance reliability and efficacy of plants that "could not seem to get their

13  maintenance in order" or had excessive maintenance costs.  (Doc. #121, ¶ 261.)  Sullivan

14  analyzed the plant from planning to maintenance and reported his recommendations.  (*Id.*

15  at ¶ 262.)  Sullivan's report stated, "The facility is in major disrepair and the Maintenance

16  Department needs some firm and fair leadership in order for the plant to turn around."

17  (Doc. #112-6 at 23.)  The report further stated, "There is obvious years of negligence in

18  this facility that is crippling its ability to compete effectively in the marketplace," and

19  "My immediate recommendations are to replace the Maintenance Manager," referring to

20  Ives.  (*Id.*)  Flores agreed with those statements and recommendation.  (*Id.*)  Flores also

21  said he had "misgivings about Mr. Ives's ability to help us turn the plant around." (*Id.*)

22      There is evidence that equipment downtime affected profitability only if the

23  machine was needed at the time, Ives had to reschedule preventive maintenance on a daily

24  basis to avoid delaying customer orders, the Production Manager shared responsibility

25  with Ives for ensuring preventive maintenance was performed, and when preventive

26  maintenance is not performed as scheduled, it increases the risk of a potential breakdown.

27  But there is no affirmative evidence that Ives performed his job satisfactorily—just that

28

1   others shared the blame with him for the "major disrepair" of the facility and its

2   equipment.

3          Thus, even presuming the EEOC's evidence to be true, the court concludes the

4   EEOC has not produced the minimal degree of proof required to establish Ives'

5   satisfactory performance.  Because the EEOC has failed to establish a *prima facie* case of

6   discrimination regarding Ives' termination, the court does not complete the remainder of

7   the *McDonnell Douglas* analysis with respect to Ives.

8          **D.     Stage II of *McDonnell-Douglas* Analysis:  TIN Has Articulated
               Legitimate Nondiscriminatory Reasons for Terminating The
9              Employees.**

10         TIN has articulated the following reasons for its employment decisions regarding

11  Neal, Flores, McGraw, and Vanecko:

12                 **1.     David Neal**

13         TIN asserts it terminated Neal as General Manager because he was responsible for

14  all aspects of the Phoenix plant, the Phoenix plant was not profitable after six years of

15  Neal's management, and  Neal was not meeting TIN's legitimate expectations.  (Doc.

16  #110 at 5-6.)  TIN further asserts that Mishurda believed in good faith that Neal (1) could

17  not improve the Phoenix plant's performance as quickly as TIN wanted it improved, (2)

18  was not focused on the plant's business, and (3) did not appear to accept Garza as his

19  manager.  (*Id.* at 9.)

20                 **2.     Hector Flores**

21         TIN asserts it terminated Flores as General Manager based on Siebert's assessment

22  of the Phoenix plant's financial performance under Flores, the plant's physical condition,

23  Siebert's opinion that Flores was not effectively leading the plant, and Siebert's lack of

24  confidence that Flores could work to achieve TIN's goals for the plant given Flores's past

25  performance.  (*Id.* at 10.)

26

27

28

1

### 3. Clifton McGraw

2    TIN asserts it eliminated the Logistics Manager position, which McGraw held,

3  because Garza believed the position was not adding value and eliminating it would reduce

4  the Phoenix plant's excessive fixed costs.  (*Id.* at 10-11.)

5

### 4. John Vanecko

6    TIN asserts Garza consolidated the Plant Controller position held by Vanecko and

7  Regional Controller position held by Cervantes to reduce the Phoenix plant's fixed costs

8  and that Cervantes was qualified to perform both jobs whereas Vanecko was not.

9    Although the EEOC disputes the methods TIN used to determine that the Phoenix

10  plant was not profitable and what factors contributed to the plant's profitability, the

11  undisputed evidence shows that TIN management had concerns regarding the Phoenix

12  plant's profitability and fixed costs.  (Doc. #120, ¶¶ 6-12, 77-78, 86-88, 97, 116-120, 206,

13  232-234; doc. #121, ¶¶ 45-46, 55-56, 93, 103-111, 146, 190.)  It also is undisputed that

14  TIN acquired the Phoenix plant in April 2002 and changed the Phoenix plant's position in

15  the corporate structure during the summer of 2002, in January 2006, and in November

16  2006.  (Doc. #121, ¶¶ 4, 8, 10-11, 15, 19.)  Further, the parties agree that eliminating jobs

17  is one way to reduce costs.  (*Id.* at ¶ 194.)  Therefore, TIN has articulated legitimate,

18  nondiscriminatory reasons for its employment decisions regarding Neal, Flores, McGraw,

19  and Vanecko, and the presumption of discrimination created by the *prima facie* cases

20  disappears.  *See Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889, 892 (9th Cir. 1994).

21

22

### E. Stage III of *McDonnell-Douglas* Analysis:  A Reasonable Jury Could Not Conclude by a Preponderance of the Evidence that TIN Terminated Neal, Flores, McGraw, and Vanecko Because of Their Age.

23    At the third stage, the EEOC must produce enough evidence that a reasonable jury

24  could conclude by a preponderance of the evidence that TIN terminated the employment

25  of Neal, Flores, McGraw, and Vanecko because of their age.  The EEOC has offered (1)

26  purported evidence that TIN's explanations for the terminations are not credible and (2)

27  evidence of comments it argues demonstrate age-based bias and give rise to an inference

28  TIN had a discriminatory motive when it terminated these employees .

1          In *Pottenger v. Potlatch Corp.*, 329 F.3d 740 (9th Cir. 2003), the Ninth Circuit held

2    a former employee failed to create a genuine factual issue of pretext and affirmed

3    summary judgment for the employer in circumstances similar to those here.  In *Pottenger*,

4    a former divisional vice president made a *prima facie* case of age discrimination:  he was

5    60 years old, his most recent performance review indicated he was meeting job

6    requirements, he was discharged, and he was replaced by a 43-year-old employee with

7    equal or inferior qualifications.  *Id.* at 745-46.  The employer articulated a legitimate,

8    nondiscriminatory reason for terminating the employee:  "a lack of confidence that [the

9    vice president] could make the hard decisions necessary to turn around the ailing []

10   Division, which he headed."  *Id.* at 746.  The appellate court explained that at the

11   summary judgment stage, the employee's burden is "not high" because "[h]e must only

12   show that a rational trier of fact could, on all the evidence, find that [the employer's]

13   explanation was pretextual and that therefore its action was taken for impermissibly

14   discriminatory reasons."  *Id.*  To show the employer's explanation was unworthy of

15   credence, the former vice president argued that his performance review included positive

16   comments, the employer's justifications for his dismissal were shifting, and the company

17   did not follow a formal discharge procedure.  *Id.*  The employer's justification for the

18   termination, however, was not that the former vice president was incompetent or a bad

19   employee, but rather the employer lacked confidence that the vice president could help

20   turn the company around.  *Id.*  The justification was consistent with the performance

21   review and had not shifted.  *Id.*  Further, there was little evidence the company had an

22   established procedure for discharging high-level employees, and, therefore, failing to

23   follow some unspecified procedure did not cast any doubt on the employer's justification.

24   *Id.* at 746-47.

25          The former vice president also attempted to prove discriminatory motive for his

26   termination through evidence that his supervisor, the company president, made comments

27   referring to an "old management team," an "old business model," and "deadwood."  *Id.* at

28   747.  The appellate court found these remarks, in the context of that case, did not support

1    an inference of age discrimination and, therefore, did not create a triable issue of material

2    fact that would defeat summary judgment.  *Id.*  After considering all of the former vice

3    president's evidence of pretext, the court concluded that it did not refute the employer's

4    basic rationale for the termination, *i.e.*, the division was losing money and the company

5    lacked faith that this individual was the one to turn the division around.  *Id.* at 748.  The

6    court explained that the company "has leeway to make subjective business decisions,

7    even bad ones," and although it may have been unfair and perhaps unwise to blame the

8    former vice president for the division's losses, "it is not surprising that [the company's]

9    bosses would try to make a change in leadership in a division that was having such

10   consistent trouble." *Id.* at 748-49.  Thus, even though the employee's evidentiary burden

11   was "not high," the appellate court held he had not created a genuine factual issue of

12   pretext and affirmed the summary judgment.  *Id.* at 749.

13              **1.    The EEOC Has Not Established that TIN's Justification for Its
                       Employment Decisions Is Unworthy of Credence.**

14

15              The EEOC argues that TIN's justifications for the terminations are not credible

16   because shifting and inconsistent reasons suggest the "official reasons" are not the "true

17   reasons" and, thus, are evidence of pretext.  (Doc. #119 at 14.)  The EEOC  contends that

18   TIN now is attempting to justify the terminations as based on the employees' poor

19   performance, but no evidence was prepared contemporaneously with the terminations to

20   show that the class members were terminated for performance reasons.  (*Id.*)  Although

21   the Ninth Circuit has held "fundamentally different qualifications for an employer's

22   action ... give rise to a genuine issue of fact with respect to pretext," the EEOC has not

23   identified *fundamentally different* explanations made by TIN for any of the class

24   members.  *See Pottenger*, 329 F.3d at 746.  It is true that TIN argues here that the

25   terminated employees had poor performance, but that is to show the EEOC cannot

26   establish a *prima facie* case of discrimination in Stage I because it cannot prove each

27   class member performed his job satisfactorily.  That does not mean TIN has abandoned its

28   previously articulated explanations for the terminations.  The EEOC has not shown that

1   TIN has fundamentally shifted its justifications to the extent the court should infer they
2   are not credible.

3          Moreover, the EEOC has not demonstrated that TIN's explanations are internally
4   inconsistent or otherwise not believable:

5          **Neal and Flores.**  The EEOC argues that because the Phoenix plant lost money for
6   years before and after TIN acquired it, plant profitability must not have been the real
7   reason for terminating these General Managers.   The EEOC also argues that neither
8   General Manager was terminated "for cause," and that Mishurda and Garza made
9   decisions that affected plant profitability and deprived Flores of the autonomy given to
10  other General Managers.  Mishurda and Garza hired Flores and they were not involved in
11  his termination.  Further, there is no evidence they influenced Siebert and Grube to
12  terminate Flores shortly after responsibility for the Phoenix plant was reassigned.  As in
13  *Pottenger*, TIN "has leeway to make subjective business decisions, even bad ones," and it
14  is not surprising that shortly after acquiring the unprofitable Phoenix plant and again
15  shortly after reorganizing supervision over the plant, TIN would change plant
16  management.

17         **McGraw.**  Garza created the Logistics Manager position, which existed at other
18  plants, and four months later eliminated the position at the Phoenix plant.  TIN contends
19  it eliminated the position to reduce fixed costs and if Garza had wanted to terminate
20  McGraw because of his age, he could have done so instead of transferring him to the
21  Logistics Manager position.  Moreover, when Garza took over Neal's General Manager
22  job, McGraw was 61 years old and had been Production Manager for less than 90 days.
23  Garza easily could have terminated McGraw at that point if he was motivated by age-
24  based animus. The fact that at one point TIN incorrectly stated McGraw's reason for
25  leaving was that he had chosen voluntary early retirement is not sufficient to create an
26  inference that cost reduction was not the real reason for eliminating the Logistics
27  Manager position.

28

1      **Vanecko.**  Because the regional controller's office was located at the Phoenix

2  facility, TIN consolidated the Regional Controller and Plant Controller positions to

3  reduce the Phoenix plant's fixed costs.  Such consolidation would not have been possible

4  at other plants where a regional controller did not have an office.  Garza chose to fill the

5  consolidated position with the person holding the regional position instead of the one

6  holding the plant position because the consolidated position required skills needed for

7  both positions.  Garza's opinion that the person holding the consolidated position should

8  speak Spanish and understand Mexican tax law is not unbelievable where the

9  consolidated position included responsibilities for a plant in Mexico, even if the

10  controllers did not prepare income tax filings.

11              **2.      The EEOC Has Not Produced Credible Evidence That a**
                           **Discriminatory Reason More Likely Motivated TIN to**
12                         **Terminate Neal, Flores, McGraw, and Vanecko.**

13      Mishurda's and Garza's comments that the EEOC contends show age-based

14  animus are insufficient to conclude that a discriminatory reason more likely motivated

15  TIN to terminate Neal, Flores, McGraw, and Vanecko than did TIN's explanations for the

16  terminations.  Mishurda may have "connected age with energy, health, vitality, and

17  creativity," and Garza may have been concerned about whether older applicants had the

18  physical ability or endurance to handle certain jobs, but their comments do not suggest

19  that Mishurda and Garza made employment decisions based on stereotypes about age

20  instead of evaluating each applicant's or employee's actual abilities.  Questioning

21  whether an experienced sales manager is willing and able to climb stairs in the Phoenix

22  summer heat, wondering whether a sales manager in his 70's is actively pursuing new

23  customers, and expressing concerns about an overweight sales manager spending too

24  much time drinking, golfing, and possibly coasting into retirement while still on the

25  payroll may be legitimate business concerns.  Despite their questions and concerns,

26  however, the evidence shows Mishurda and Garza hired older employees, and they

27  replaced Neal, Flores, and McGraw with employees who were more than 40 years old.

28

1    Thus, a company's preference for "energetic," "fresh," and "youthful," rather than

2    "old school" and "old fashioned," does not necessarily reflect age-based animus or

3    provide credible evidence that a discriminatory reason motivated TIN to terminate Neal,

4    Flores, McGraw, and Vanecko.

5    **IV.   Conclusion**

6    The EEOC has not provided direct evidence that the terminations of Neal, Flores,

7    McGraw, Vanecko, and Ives were motivated by age-based animus.  The EEOC has

8    established a *prima facie* case of age discrimination for the terminations of Neal, Flores,

9    McGraw, and Vanecko, but not for Ives.  TIN has articulated legitimate,

10   nondiscriminatory reasons for the terminations of Neal, Flores, McGraw, and Vanecko.

11   The EEOC has not established that TIN's articulated reasons are mere pretext.  Presuming

12   the EEOC's evidence to be true and drawing all reasonable inferences from the evidence

13   in the light most favorable to the EEOC, a reasonable factfinder could not conclude that

14   age discrimination was the real reason for the terminations of Neal, Flores, McGraw,

15   Vanecko, and Ives.  Therefore, the court will grant TIN's motion for summary judgment.

16   IT IS THEREFORE ORDERED that Plaintiff's Motion to Strike and Motion for

17   Leave to File Surreply (doc. #131) is granted, striking Defendant TIN's Response to

18   Plaintiff EEOC's Statement of Facts in Opposition to Defendant's Motion for Summary

19   Judgment (doc. #129) and Defendant TIN's Supplemental Appendix of Materials in

20   Support of Its Response to Plaintiff EEOC's Statement of Facts in Opposition to TIN's

21   Motion for Summary Judgment (doc. #130).  The Clerk shall leave the documents imaged

22   in the electronic records of the court.

23   IT IS FURTHER ORDERED that Defendant TIN's Motion for Summary

24   Judgment (doc. #110) is granted.

25   / / /

26

27

28

1    IT IS FURTHER ORDERED that the Clerk of the Court enter judgment in favor

2  of Defendant and that Plaintiff take nothing on its complaint.  The Clerk shall terminate

3  this action.

4    DATED this 2nd day of June, 2008.

5

6

7  _____

8  Neil V. Wake
   United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28